NOT DESIGNATED FOR PUBLICATION

No. 126,913

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

TERRY ALLAN ROSS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; SETH L. RUNDLE, judge. Oral argument held November 12, 2024. Opinion filed May 9, 2025. Reversed and remanded with directions.

*Chelsea Anderson*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellant.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, for appellee.

Before ATCHESON, P.J., CLINE and PICKERING, JJ.

CLINE, J.: In this appeal, the State challenges the district court's dismissal of two counts of abuse of a child after a preliminary hearing. The State argues that it established probable cause to believe Terry Allan Ross committed the charged crimes and the court improperly considered the affirmative defense of parental discipline to support its dismissal of the second charge. After examining the record and considering the parties' arguments, we reverse the district court's dismissal and remand the case for further proceedings on both charges. We find the affirmative defense of parental discipline does

1

not apply to the crime of child abuse and the State established probable cause to bind Ross over on both counts.

## FACTUAL AND PROCEDURAL BACKGROUND

In November 2022, the State charged Ross with two counts of abuse of a child for acts Ross allegedly committed against his seven-year-old son A.R. In count one, Ross was charged with a severity level 3 person felony under K.S.A. 2022 Supp. 21-5602(a)(3)(C), which is "knowingly impeding the normal breathing or circulation of the blood by applying pressure on the throat, neck or chest of the child or by blocking the nose or mouth of the child in a manner whereby death or great bodily harm could be inflicted." In count two, he was charged with a severity level 5 person felony under K.S.A. 2022 Supp. 21-5602(a)(1)(A), which is "[k]nowingly torturing, cruelly beating, cruelly striking or cruelly kicking" a child under 18 years of age.

Because this court must decide whether there was sufficient evidence to bind Ross over for trial on these charges, resolution of this appeal hinges on the evidence presented at Ross' preliminary hearing. The State called four witnesses to testify about the circumstances leading to the charges.

The first witness, Sara Doberer, was the nurse at A.R.'s elementary school. She said A.R.'s teacher brought him to the health room shortly after school began one day because the teacher noticed marks on his neck. Doberer also observed the marks. When asked about them, A.R. told Doberer that his dad had gotten mad at him and grabbed his shirt after school the day before. A.R. demonstrated what happened by twisting his shirt and pulling it up, and Doberer noticed "the shirt matched exactly the marks on his neck." A.R. also told Doberer he had been hit in the back and with a belt on his bottom the day before, after school.

Doberer gave A.R. an ice pack and completed an online report to the Kansas Department for Children and Families (DCF) describing what she saw. Doberer said she "was concerned that there might be more to the story than he was telling" her, and that she "needed to get him protection."

After school, a patrol officer drove A.R. to the Child Advocacy Center to be interviewed because of the allegations of physical abuse in the home. Detective Gabriel Ohmart and Lexandria Vrana, a licensed social worker in DCF's Exploited and Missing Child Unit, conducted the interview.

Vrana testified that she noticed a mark on A.R.'s neck and he showed her a mark on his arm. She said A.R. disclosed two incidents of physical abuse. When detailing the incidents at the preliminary hearing, she explained:

"Q. Can you please start off with that first incident he told you about?
"A. Yes. He told me that he had gotten in trouble between the first and third day of school that year for bringing home a necklace that another child at school had given him, and he got in trouble for that when he got home and was disciplined, using a stick—a white stick and a hand.
"Q. And did he say who disciplined him?
"A. Yes.
"Q. Who did he say disciplined him?
"A. His dad.
"Q. And on the second incident, did he tell you what happened on that second incident?
"A. Yeah. He said that, on the second incident, which was August 18th, the day before I interviewed him, he said the same boy that he had gotten in trouble with earlier that week, that they were at school, and that he had grabbed the boy's hand and got in trouble for holding the boy's hand and was—had gotten in trouble when he got home by his dad.
"Q. And when he said he got in trouble, did he tell you how he got in trouble?

"A. Yes. He said that he was—he got a whooping with the black and the brown belt in the garage, and that his dad had choked him.

"Q. Did he say how his dad choked him?

"A. He showed me—he demonstrated and told me. He said his dad choked him using his own shirt. He demonstrated how that happened and grabbed his own shirt several times in the interview.

"Q. Did he say how he felt when this was happening?

"A. He said that he couldn't breathe, and that he was trying to get his dad's hand away from it so that he could breathe."

Vrana said A.R. told her the bruise on his arm was from the first incident. When asked about how big the white stick was, A.R. told Vrana it was too big for his mom's hands but big enough for his dad's. She recalled that A.R. mentioned his dad told him holding hands with the boy was not right.

When asked about the injuries to his neck, A.R. told Vrana his dad held his shirt very closely, his dad was strong, and his dad pulled his shirt back and forth. A.R. told Vrana only he and his dad were in the garage when this occurred.

Detective Ohmart provided a similar account of A.R.'s interview. He also described a conversation he had with A.R.'s stepmother. Ohmart testified that the stepmother identified herself as the disciplinarian in the home. But she told Ohmart that Ross would "yell, grab ahold of their shirt, and bring [the children] from wherever they're at" to do so. When asked about A.R.'s claim, Ohmart testified the stepmother told Ohmart that A.R. was given a necklace by a boy and held hands with a boy at school and "they were trying to nip the gay—I can't remember verbatim what it was, but the gay acts associated with that."

Wendy Hartman, a forensic nurse at Wesley Medical Center, testified about her interview with A.R. after he was sent by the Child Advocacy Center for medical care.

4

She explained that A.R. told her that he had been choked by his dad and hit with a belt, so she looked for injuries that could have been caused by those acts.

The State admitted four diagrams or charts that Hartman created to document A.R.'s injuries. Hartman documented several bruises on A.R.'s chest, bottom, thigh, back, and side of his neck, an abrasion on his arm, and multiple petechiae on his chest. The State also admitted two pictures Hartman took of A.R., one of which documented the bruise on his neck that extended from near A.R.'s ear to his chin.

When asked about the bruising on his neck, Hartman testified A.R. told her that his dad grabbed his shirt and twisted it, and A.R. demonstrated this to Hartman. When asked why A.R. thought his dad did this, he responded that his dad did not love him. But he also told Hartman that his dad stopped because he did not want to lose his only son.

Hartman elaborated on what could happen if someone twisted a t-shirt up and caused a restriction like what A.R. demonstrated:

> "So, any compression of the neck, I like to tell my patients—because everybody's aware that it cuts off your airflow. But, the other thing it does is it impedes the blood flow in your neck, and anytime blood slows down, it wants to clot. Plus, the amount of pressure that's being applied there, there's a wide variety of injuries that can happen. You can have no injury, which half of strangulations have no injury. You could have bruising. You can have a hoarse voice. If there is a clot there that moves later, you can have stroke symptoms, you know numbness, weakness on one side, trouble talking."

Hartman admitted restricting one's blood flow or airflow can cause serious harm. And on cross-examination, she demonstrated how A.R. showed being grabbed both through what he told her and from the photo of the bruise. She also discussed identifying what she characterized as "loop mark injuries" on A.R., which appeared to be caused by the "loop" created when a belt is doubled over.

*The district court's ruling*

At the conclusion of evidence, the prosecutor asked the district court to bind Ross over on both charges. Defense counsel argued there was no probable cause to support the charges. Though neither party suggested that the district court should apply the parental discipline affirmative defense, the court brought it up but said it would not consider it. Parental discipline is recognized in Kansas as an affirmative defense to charges of battery and aggravated battery. PIK Crim. 4th 54.311 (2019 Supp.) ("It is a defense to the charge of [battery] [aggravated battery] if a parent's use of physical force upon a child was reasonable and appropriate, and with the purpose of safeguarding the child's welfare or maintaining discipline.").

The district court dismissed count one without prejudice. It found probable cause lacking because the court did not "believe that the application of pressure on the throat or neck was done in a manner whereby death or great bodily harm could be inflicted." The court took count two under advisement.

A few weeks later, the district court dismissed count two in a written decision. The court began by stating, contrary to its comments at the preliminary hearing, it would consider the parental discipline defense as to count two. Based on the evidence presented and when considering the evidence in the context of this defense, the district court found no probable cause existed to support that count. Instead, it found Ross' alleged conduct fell "within the discretionary exercise of a parental right."

The State appealed the dismissal of both charges. After oral argument, we asked the parties to provide supplemental briefing on several issues. Both parties timely responded with thoughtful answers to our questions.

I. *Did the district court err by finding the State had not established probable cause at the preliminary hearing for the first child abuse charge?*

*Standard of review*

At a preliminary hearing, the district court examines the evidence and determines: (1) whether a crime has been committed and (2) whether there is probable cause to believe that the accused committed the crime. *State v. Washington*, 293 Kan. 732, 733, 268 P.3d 475 (2012). On appeal, we exercise unlimited review over the district court's probable cause findings. 293 Kan. at 733-34.

Under K.S.A. 22-2902(c), "the State's burden of proof at a preliminary hearing is not proof beyond a reasonable doubt, only probable cause." *State v. Rozell*, 315 Kan. 295, Syl. ¶ 2, 508 P.3d 358 (2022). At a preliminary hearing, probable cause means "'evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt.'" *Washington*, 293 Kan. at 734.

When determining whether the State satisfied the standard, the district court "must draw inferences favorable to the prosecution from the evidence presented and should not be concerned with sufficiency of the evidence to support a conviction." 293 Kan. at 734. Even if the evidence is weak, the defendant should be bound over for trial if the evidence tends to establish that the defendant committed the charged offense. 293 Kan. at 734. If the evidence fails to establish probable cause that a felony has been committed, the court must discharge the defendant. K.S.A. 22-2902(c).

*The State presented sufficient evidence to bind Ross over on the first charge.*

The State contends the evidence presented at the preliminary hearing—when viewed in the light most favorable to the prosecution—established probable cause to bind Ross over on the charge under K.S.A. 21-5602(a)(3)(C). This offense defines abuse of a child as "knowingly impeding the normal breathing or circulation of the blood by applying pressure on the throat, neck or chest of the child or by blocking the nose or mouth of the child in a manner whereby death or great bodily harm could be inflicted." K.S.A. 21-5602(a)(3)(C). The State argues the district court erred by evaluating whether the charge would result in a conviction instead of whether there was probable cause to support the charge.

The State points to the following evidence presented at the preliminary hearing, which it believes is sufficient to satisfy the probable cause standard for count one: (1) A.R. was seven years old, (2) A.R. reported that his father grabbed his shirt, twisting and pulling it up, choking him, (3) A.R. could not breathe and tried to move his dad's hand away so that he could breathe, (4) A.R. said his father stopped strangling him so that he wouldn't lose his only son, (5) a forensic nurse testified the injury observed on A.R.'s neck was consistent with his report of being strangled, (6) the nurse testified that cutting off airflow or blood flow in the neck could cause serious harm, and (7) the State introduced a picture of the injury to A.R.'s neck sustained during this incident.

To put this evidence in context, the State analogizes to several Kansas appellate decisions on strangling or choking in aggravated battery situations. The State contends this caselaw is persuasive because the child abuse and aggravated battery statutes use similar language. Under K.S.A. 21-5413(b)(1)(C), one of the definitions of aggravated battery includes "knowingly causing physical contact with another person . . . in any manner whereby great bodily harm, disfigurement or death can be inflicted." And the child abuse charge here requires a showing that the perpetrator "knowingly imped[ed] the

8

normal breathing or circulation of the blood by applying pressure on the throat, neck or chest of the child . . . in a manner whereby death or great bodily harm could be inflicted." K.S.A. 21-5602(a)(3)(C). Given these similarities, we find the cases cited by the State are instructive.

To begin, the State cites *State v. Williams*, 308 Kan. 1439, 430 P.3d 448 (2018). There, the Supreme Court found the victim's testimony that the defendant choked her and the responding officer's observation of marks on the victim's neck which were consistent with strangulation established the aggravated battery charge because "[s]trangulation can result in great bodily harm or death." 308 Kan. at 1458. Similarly, the witnesses here testified A.R. told them his father had choked him by twisting his shirt and they noticed marks on A.R.'s neck consistent with this account. The State also entered a picture of the injuries on the left side of A.R.'s neck into evidence, which Hartman testified extended to a total area of 4.5 centimeters by 1.515 centimeters. And Hartman agreed restricting blood or air flow can cause serious harm.

The State next cites *State v. Curreri*, 42 Kan. App. 2d 460, 213 P.3d 1084 (2009). In that case, the defendant challenged his aggravated battery conviction by arguing the victim did not actually suffer great bodily harm. He contended that the extent of the victim's injury supported simple battery but not aggravated battery. 42 Kan. App. 2d at 465-66. But our court pointed out, "[t]he plain language of the [aggravated battery] statute focuses on the potential that great bodily harm, disfigurement, or death *can* be inflicted, not whether these consequences actually occurred." 42 Kan. App. 2d at 465. And we noted there was ample testimony that the defendant's choking of the victim "could have resulted in serious injury or death." 42 Kan. App. 2d at 466. We also pointed out that "whether the defendant's conduct could cause great bodily harm under K.S.A. 21-3414(a)(1)(B) [now K.S.A. 21-5413(b)] is a question of fact for the jury." 42 Kan. App. 2d at 465-66; see also *State v. Morton*, 38 Kan. App. 2d 967, 972, 174 P.3d 904 (2008).

9

Likewise, the State presented evidence that Ross' actions could have resulted in serious injury to A.R.

The State also cites *State v. Hill*, No. 116,788, 2018 WL 4656168 (Kan. App. 2018) (unpublished opinion), and *State v. Atkins*, No. 84,707, 2000 WL 36746101 (Kan. App. 2000) (unpublished opinion). In both cases, we found sufficient evidence to support convictions for aggravated battery. In *Hill*, the victim testified that Hill put his hands around her neck, she was unable to breath, and she had to push Hill away to free herself, and there was testimony from Hill and another witness that Hill choked her. 2018 WL 4656168, at *4. And in *Atkins*, the State presented evidence that the defendant choked the victim for approximately 30 seconds, the victim testified she could not breathe, and he asked her if she wanted to "'die today'" during the choking. 2000 WL 36746101, at *2. As in both these cases, the State provided similar evidence against Ross. At Ross' preliminary hearing, witnesses testified that A.R. told them he was unable to breathe, he had to push Ross away when Ross was choking him with his shirt, and he heard his dad tell him the reason he stopped is that he did not want to lose his only son. Further, Ross' comment indicates he perceived the potential that A.R. could die if Ross continued to apply pressure to A.R.'s neck by twisting A.R.'s shirt.

Ross counters by arguing the district court viewed the demonstrations by the witnesses in the courtroom, which we cannot, since they are not preserved in the record by video or otherwise. He contends these demonstrations showed the way Ross applied pressure to A.R.'s neck, and the court correctly determined it was not done "in a manner whereby death or great bodily harm could be inflicted." K.S.A. 21-5602(a)(3)(C). And he points out the general rule that appellate courts cannot reweigh evidence or pass on the credibility of witnesses. See *In re M.F.*, 312 Kan. 322, 331-32, 475 P.3d 642 (2020).

But the district court was not presented with a credibility contest, and it made no credibility findings. And Ross construes both the evidence presented and our role here

too narrowly. For one, the physical demonstrations were not the only evidence presented. Witnesses testified about A.R.'s description of the incident, and the State introduced a picture of A.R.'s neck which demonstrated the injury he sustained from the incident. When viewing this evidence in the light most favorable to the State—as we must do—we find it sufficient to satisfy the probable cause standard.

Ross also overgeneralizes the State's position. He contends the State's reliance on Hartman's testimony means each time a defendant impedes a child's breathing or circulation, the State would then have probable cause that death or great bodily harm could have resulted. Hartman testified that the injury she observed on A.R.'s neck was consistent with his report of being strangled *and* that cutting off airflow or blood flow in the neck can cause serious harm. And again, this testimony was not the only evidence the State provided to support a finding of probable cause regarding Ross' application of pressure on his seven-year-old son's neck, as described above.

At the preliminary hearing stage, even if the evidence is weak, the defendant should be bound over for trial if the evidence tends to establish that the offense charged was committed and that the defendant committed it. *Washington*, 293 Kan. at 734. It is not the court's function to "conclude there should be no prosecution because the possibility of a conviction may be remote or virtually nonexistent." *State v. Wilson*, 267 Kan. 530, 534, 986 P.2d 365 (1999). "The prosecutor, not the court, is vested with the discretion of whether to prosecute a case if the probable-cause standard has been met." *State v. Tucker*, No. 116,033, 2017 WL 3324711, at *3 (Kan. App. 2017) (unpublished opinion).

Given the evidence, we find the district court erred by not binding Ross over on the charge in count one. The State met the threshold probable cause standard to send to a jury the question of whether Ross' actions were knowingly undertaken in a manner whereby death or great bodily harm could have been inflicted on seven-year-old A.R.

11

II. *Did the district court err by determining that the affirmative defense of parental discipline supported dismissal of the second child abuse charge?*

The affirmative defense of parental discipline arose in an unusual way here. Neither party discussed it at the preliminary hearing, nor did Ross rely on it. Instead, Ross argued the State failed to show when A.R.'s injuries occurred, that those injuries were caused by the actions alleged in the complaint, or that Ross had caused the injuries. And the district court, when explaining its decision-making process at the hearing, said it would not consider whether the parental discipline defense applied to the child abuse charges and said its findings were "not based on any issue relating to the common law affirmative defense of parental discipline."

Yet when the district court issued its written decision dismissing count two, it changed course and considered the parental discipline defense. The court found the evidence showed that Ross "spank[ed] or whip[ped] or beat[] his seven year old son across the buttocks and the top of the legs or lower back (leaving markings) with his hand, a belt, and a stick on two separate occasions." But it found no probable cause to support the charge in count two because it found the case "involves conduct falling within the discretionary exercise of a parental right."

On appeal, the State argues the district court erred by recognizing parental discipline as a defense to child abuse because it is only appropriate as a defense to the crimes of battery and aggravated battery. Ross counters by arguing the defense applies any time physical force is used on a child, and therefore the court properly considered it.

*Standard of review*

Affirmative defenses "are neither elements of the alleged offense nor do they negate any element of the offense. Rather, affirmative defenses provide a legally recognized justification for the action such that the actor cannot be held criminally or

12

civilly liable." *May v. Cline*, 304 Kan. 671, 676, 372 P.3d 1242 (2016). An affirmative defense may be established by statute or arise from common law. See *State v. Scobee*, 242 Kan. 421, 428, 748 P.2d 862 (1988).

The question before us—whether parental discipline is a defense to child abuse charges—is a question of law subject to unlimited review. See *State v. Branson*, 38 Kan. App. 2d 484, Syl. ¶ 1, 167 P.3d 370 (2007).

*Parental discipline is a common-law affirmative defense recognized against battery charges.*

Under the United States Constitution, parents have the fundamental right to make decisions concerning their children. The United States Supreme Court has explained that "[t]he child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Pierce v. Society of Sisters*, 268 U.S. 510, 535, 45 S. Ct. 571, 69 L. Ed. 1070 (1925); see also *Moore v. East Cleveland*, 431 U.S. 494, 505, 97 S. Ct. 1932, 52 L. Ed. 2d 531 (1977) ("Decisions concerning child rearing" are "recognized as entitled to constitutional protection."). And the United States Supreme Court observed that parents' liberty interests in the "care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

But this right is not without limits and the State "has a powerful interest in preventing and deterring the mistreatment of children." *Willis v. State*, 888 N.E.2d 177, 180 (Ind. 2008); see also *Parham v. J. R.*, 442 U.S. 584, 603, 99 S. Ct. 2493, 61 L. Ed. 2d 101 (1979) ("[W]e have recognized that a state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized."); *In re A.A.-F.*, 310 Kan. 125, 146, 444 P.3d 938 (2019) ("A parent's

13

constitutional rights are not without limits."). And as *Troxel* carefully points out, the constitutional presumption against state intervention exists only "so long as a parent adequately cares for his or her children." 530 U.S. at 68. The "state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare." *Prince v. Massachusetts*, 321 U.S. 158, 167, 64 S. Ct. 438, 88 L. Ed. 645 (1944).

The Kansas Legislature has expressed a public policy which equally values both the right of parents "to exercise primary control over the care and upbringing of their children in their charge" and the right of children "to protection from abuse and neglect." K.S.A. 38-141(b). At the crossroads of these two rights lies the common-law parental privilege to use reasonable and appropriate physical force to correct one's child for the purpose of safeguarding or maintaining discipline. See *State v. Wade*, 45 Kan. App. 2d 128, 136, 245 P.3d 1083 (2010). In *Wade*, the defendant was charged with battery of his child and he contended the purpose behind his actions was discipline. We recognized the common-law parental discipline privilege, "based on an objective standard," as a defense to battery and found the district court erred in failing to instruct Wade's jury on this defense. 45 Kan. App. 2d at 139-40. After *Wade*, a jury instruction was added to the Pattern Instructions of Kansas (PIK) and it substantially mirrors the *Wade* court's description of the defense. This instruction states: "It is a defense to the charge of (battery) (aggravated battery) if a parent's use of physical force upon a child was reasonable and appropriate, and with the purpose of safeguarding the child's welfare or maintaining discipline." PIK Crim. 4th 54.311 (2019 Supp.).

At its core, the parental discipline defense addresses the purpose and reasonableness of the force used. It legally excuses the reasonable application of physical force for the purpose of discipline because the force is employed to promote the welfare of or safeguard the child. This is comparable to the idea that reasonable physical force employed in self-defense is legally excused because it is engaged for a beneficial purpose—to protect oneself. Yet, as the State points out, Kansas has recognized the

14

parental discipline defense to charges of battery and aggravated battery—not child abuse. And the reasonableness of the use of force is critical in both defenses.

*Enactment of child abuse statutes and evolution of the parental discipline defense*

The Appellate Court of Maryland discussed the history of child abuse statutes and the evolution of the parental discipline defense in this country in *Bowers v. State*, 283 Md. 115, 117-18, 126, 389 A.2d 341 (1978):

> "Although the tragic phenomena of child abuse and neglect have plagued our society since its inception, . . . it was not until the late 1950's that research physicians throughout the country began to uncover evidence showing that the incidence and violence of parental attacks on children were far greater than anyone had ever anticipated. Spurred on by these shocking revelations and by a major clinical study prepared by a team of pediatricians in 1962, . . . legislatures in all fifty states rapidly adopted laws aimed directly at reducing the prevalence of physical mistreatment of children.
>
> . . . .
>
> "Long before the advent of contemporary child abuse legislation, it was a well-recognized precept of Anglo-American jurisprudence that the parent of a minor child or one standing in Loco parentis was justified in using a reasonable amount of force upon a child for the purpose of safeguarding or promoting the child's welfare. So long as the chastisement was moderate and reasonable, in light of the age, condition and disposition of the child, and other surrounding circumstances, the parent or custodian would not incur criminal liability for assault and battery or a similar offense. [Citations omitted.]"

But the Maryland court noted that when corporal punishment is administered with a malicious desire to cause pain or is cruel and outrageous, the parental privilege is not available. More specifically, the court stated:

> "[W]here corporal punishment was inflicted with 'a malicious desire to cause pain' or where it amounted to 'cruel and outrageous' treatment of the child, the chastisement was

deemed unreasonable, thus defeating the parental privilege and subjecting the parent to penal sanctions in those circumstances where criminal liability would have existed absent the parent-child relationship. Put another way, a parent was not permitted under the common law to resort to punishment which would exceed 'that properly required for disciplinary purposes' or which would extend beyond the bounds of moderation. 'Excessive or cruel' conduct was universally prohibited. [Citations omitted.]" 283 Md. at 126.

Kansas adopted its first child abuse statute in 1965. It provided:

"Any person who shall torture, cruelly beat or abuse any child under the age of sixteen (16) years or who shall willfully inflict upon such child any cruel or inhuman corporal punishment or injury resulting in a traumatic condition shall be deemed guilty of a felony and upon conviction shall be subject to punishment by imprisonment for a term not exceeding two (2) years." K.S.A. 1965 Supp. 38-714.

Although Kansas has refined and added descriptions of additional conduct which constitutes child abuse in later versions of its child abuse statute, it has consistently outlawed torture, cruel beatings, and cruel and inhuman corporal punishment. See K.S.A. 21-3609 (Torrence); K.S.A. 21-5602. The current version, which is at issue here, provides:

"(a) Abuse of a child is committing any of the following acts against a child under 18 years of age:
(1)(A) Knowingly torturing, cruelly beating, cruelly striking or cruelly kicking;
(B) knowingly inflicting cruel and inhuman corporal punishment; or
(C) knowingly using cruel and inhuman physical restraint, including caging or confining the child in a space not designated for human habitation or binding the child in a way that is not medically necessary;
(2) recklessly causing great bodily harm, abusive head trauma, permanent disability or disfigurement; or

16

(3)(A) knowingly causing great bodily harm, abusive head trauma, permanent disability or disfigurement;

(B) knowingly inflicting cruel and inhuman corporal punishment with a deadly weapon; or

(C) knowingly impeding the normal breathing or circulation of the blood by applying pressure on the throat, neck or chest of the child or by blocking the nose or mouth of the child in a manner whereby death or great bodily harm could be inflicted.

"(b) Abuse of a child as defined in:

(1) Subsection (a)(1) is a:

(A) Severity level 5, person felony if the child is at least six years of age but less than 18 years of age; and

(B) severity level 3, person felony if the child is under six years of age;

(2) subsection (a)(2) is a severity level 4, person felony; and

(3) subsection (a)(3) is a severity level 3, person felony." K.S.A. 21-5602.

*Parental discipline is not a defense to the crime of abuse of a child under K.S.A. 21-5602.*

While not explicitly addressing a parental privilege to discipline children, our Legislature nonetheless set forth the boundary between permissible parental discipline and prohibited child abuse in K.S.A. 2022 Supp. 21-5602. By restricting criminal liability for child abuse to actions involving torture, cruelty (such as "cruelly beating, cruelly striking or cruelly kicking), "cruel and inhuman corporal punishment," or acts which "recklessly cause[] great bodily harm, abusive head trauma, permanent disability or disfigurement," the Legislature enacted a definition of abuse that corresponds to the type of conduct that has traditionally fallen outside the privilege to discipline at common law. See K.S.A. 2022 Supp. 21-5602(a)(1)(A)-(B), (a)(2).

Because our Legislature defined child abuse in this way, it has incorporated the parental discipline defense—including its historic limits—into the statute by permitting parents to use corporal punishment if it does not rise to the level of being cruel and inhuman. See *Bowers*, 283 Md. at 127 ("By electing to restrict the criminal liability of

17

parents under the statute only to those cases where the parent or custodian causes his child or ward to sustain physical injury as a result of cruel or inhumane treatment or as a result of other acts of malice, the Legislature apparently intended the definition of abuse to correspond to that type of conduct which would have sufficed to destroy the privilege to discipline at common law."); *State v. Wilder*, 748 A.2d 444, 450 (Me. 2000) (noting that Maine statutes recognized a parent's privilege to exercise physical control over a child by only prohibiting cruel treatment or extreme punishment).

Ross argues (and the district court ultimately found) that parental discipline must be recognized as a defense to child abuse to accord with its fundamental constitutional underpinnings. But the parental discipline defense, by its own definition, only applies if a parent's use of physical force upon a child is reasonable and appropriate. While the dissent correctly characterizes this defense as "malleable and indeterminate," slip op. at 45 (Atcheson, J., concurring in part and dissenting in part), it is still subject to a reasonableness standard. The behavior which the Kansas Legislature has criminalized— torture, cruelty, cruel and inhuman corporal punishment, and recklessly causing a child great physical harm—was not traditionally protected, nor is it reasonable or appropriate. Allowing a parent to legally justify such conduct would contravene legislative intent and impermissibly expand the traditional scope of the parental privilege.

On the other hand, Kansas recognizes parental discipline as a defense to charges of battery and aggravated battery because conduct criminalized by Kansas' battery statute falls within the scope of conduct traditionally protected by the parental privilege to discipline. See K.S.A. 21-5413(a)(1)-(2) (outlawing "[k]nowingly or recklessly causing bodily harm to another person" or "knowingly causing physical contact with another person when done in a rude, insulting or angry manner"); K.S.A. 21-5413(b)(1)(C) (outlawing, for example, "[k]nowingly causing physical contact with another person when done in a rude, insulting or angry manner with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted"). But conduct

18

criminalized by the child abuse statute—such as torture, cruelty, cruel and inhuman corporal punishment, and recklessly causing a child great physical harm—is qualitatively different and was not traditionally protected.

The district court also reasoned that parental discipline must be recognized as a defense in child abuse cases to avoid subjecting parents to impermissibly broad prosecutorial discretion to charge them with child abuse for spanking or whipping their child. But the Legislature's definition of child abuse alleviates this concern. The definition of impermissible treatment of a child in K.S.A. 2022 Supp. 21-5602 preserves the parental privilege to use disciplinary force while placing reasonable limits on that force. Although the Legislature did not outlaw specific actions mentioned by the district court (such as "parental spanking by hand, whipping with a belt, beating with a stick, or any combination of those things if markings are left on the child, or if the marks persist on the skin beyond a certain time limit, or if a number of strikes is exceeded, or if the beating or striking occurs to certain parts of the body"), it did set forth the circumstances under which such actions are no longer reasonable and appropriate—such as when they rise to the level of torture, cruelty, cruel and inhuman corporal punishment, or recklessly causing great bodily harm to a child.

Other states have chosen to explicitly clarify that their child abuse statutes do not prohibit reasonable acts of parental discipline. Michigan's child abuse statute, for example, states that it does not prohibit "a parent or guardian, or other person permitted by law or authorized by the parent or guardian, from taking steps to reasonably discipline a child, including the use of reasonable force." Mich. Comp. Laws § 750.136b(9). And states like Hawaii and Indiana have stand-alone statutes which legally justify the use of force in parental discipline situations. See Haw. Rev. Stat. § 703-309 (describing justified use of force by persons with special responsibility for care, discipline, or safety of others); *Willis*, 888 N.E.2d at 182 (a valid claim of parental privilege is a legal justification for an otherwise criminal act under Ind. Code § 35-41-3-1).

19

Kansas has statutes which justify the use of force to defend oneself or others; to defend against an unlawful entry into or attack upon a person's dwelling, workplace, or occupied vehicle; or to defend against unlawful interference with one's property under certain circumstances. See K.S.A. 21-5222; K.S.A. 21-5223; K.S.A. 21-5225. We do not have a similar stand-alone statute which justifies the use of force to correct one's child for safeguarding or maintaining discipline, nor does our child abuse statute contain any such language. In 2014, a bill was introduced into the House Committee on Corrections and Juvenile Justice which would create an exemption for corporal punishment under the crimes of battery, domestic battery, endangering a child, and abuse of a child. This exemption would exclude the following from criminal liability under those statutes: "[a] parent, step-parent, legal guardian or custodian using corporal punishment to maintain parental authority and to discipline a child" or "a person who has written authority from a parent to use corporal punishment, including, but not limited to, a person acting as a parent or school personnel, using corporal punishment to maintain authority and to discipline a child." See H.B. 2699 (2014); House Journal, p. 3231 (May 30, 2014). But that bill did not make it out of committee.

The Legislature could have enacted statutes like Michigan, Hawaii, or Indiana or amended Kansas' child abuse statute to include a similar exemption. But instead of exempting parents from criminal liability for using corporal punishment, it restricted the amount of force that may be used on a child, whatever the reason behind the use of that force and whomever exerted it. By defining child abuse in this way, the Legislature has chosen to emphasize the actions which qualify as child abuse over the motivation behind those actions (which could be difficult to prove, be manipulated, or invoke value judgments about whether discipline for certain behavior was necessary or even appropriate). A defendant parent, like Ross, can still argue the State failed to meet its burden because the parent's actions were reasonable and appropriate and should not be considered cruel or cruel and inhuman under the circumstances. But the parent cannot claim cruel beating, cruel striking, or cruel and inhuman corporal punishment must be

20

legally excused simply because it was undertaken for the purpose of discipline. Such behavior was not permitted under common law, nor has it been allowed under any version of Kansas' child abuse statute.

It would contravene the legislative intent behind K.S.A. 2022 Supp. 21-5602 and the historic contours of the parental discipline defense to recognize it as a defense to child abuse. We therefore find the district court erred by considering and relying on it to dismiss the charge in count two.

> *The evidence at the preliminary hearing was legally and factually sufficient to bind Ross over on the charge in count two.*

The State charged Ross in count two with abuse of a child under K.S.A. 2022 Supp. 21-5602(a)(1)(A), which is defined as: "[k]nowingly torturing, cruelly beating, cruelly striking or cruelly kicking" a minor child. The State asks us to reverse the district court's dismissal of count two and remand the matter for the district court to bind Ross over for arraignment on this charge. Since our standard of review for the court's probable cause finding is de novo, we can review the evidence presented at the preliminary hearing to see if it supports a probable cause finding. *Washington*, 293 Kan. at 733-34.

The State alleges the evidence established that Ross struck A.R. with his hand, a belt, and a stick. And it points out Hartman documented injuries all over seven-year-old A.R.'s body—his bottom, legs, back, chest, rib area, and arm—including "loop marks" consistent with being struck by a belt and linear marks on his chest consistent with being struck with a stick. It also notes Vrana testified A.R. described the stick Ross used as too big for his mother's hand.

21

1. *We disagree with Ross' and the dissent's contentions that the State's charge under K.S.A. 2022 Supp. 21-5602(a)(1)(A) was legally insufficient.*

While Ross admits the evidence showed "physical discipline utilizing a belt and/or stick that left marks," he argues the district court's dismissal of the charge should be affirmed based on a parent's fundamental right to discipline his or her child. And absent application of the parental discipline defense, Ross argues the district court was correct to dismiss the charge for another reason—he contends there was no legal basis to bind him over on that charge. He asks us to affirm the court's dismissal of the charge because it was "'right for the wrong reasons.'" *State v. Oehlert*, 290 Kan. 189, 191, 224 P.3d 561 (2010) (A district court may be affirmed on appeal on a theory not raised below when it is right for the wrong reasons.). This is essentially the argument made by our dissenting colleague as well. That is, the dissent argues Ross could only be bound over on a charge of cruel and inhuman punishment in violation of (a)(1)(B) because the evidence shows his actions were done to discipline his son.

Ross argues he cannot be bound over on the charge in count two based on the "general/specific rule." This rule provides that "[w]hen there is a conflict between a statute dealing generally with a subject and another statute dealing specifically with a certain phase of it, the specific statute controls unless it appears that the legislature intended to make the general act controlling." *State v. Wilcox*, 245 Kan. 76, Syl. ¶ 1, 775 P.2d 177 (1989).

Ross contends K.S.A. 2022 Supp. 21-5602(a)(1)(B), which outlaws cruel and inhuman corporal punishment, is the more specific crime and K.S.A. 2022 Supp. 21-5602 (a)(1)(A), which outlaws cruelly beating or cruelly striking a child, is the general crime of child abuse. According to Ross, because his actions were undertaken to discipline his son, the general/specific rule precludes his conviction for the general crime of child abuse

22

under (a)(1)(A). Ross says the district court correctly dismissed his charge under (a)(1)(A) because he argues there was no legal basis to bind him over on that charge.

The main problem with this argument is our Supreme Court turned away from the general/specific rule in *State v. Euler*, 314 Kan. 391, 396, 499 P.3d 448 (2021), after finding "this rule has questionable applicability and sketchy origins in our caselaw." Instead, the court found that "when the plain language of a criminal statute unambiguously applies to a given set of facts, the Legislature necessarily intended that statute to apply." 314 Kan. at 400. And here, Ross admits the evidence shows conduct that satisfies the actions addressed in K.S.A. 2022 Supp. 21-5602(a)(1)(A) (striking or beating), even if the more specific language addressing actions undertaken as corporal punishment in K.S.A. 2022 Supp. 21-5602(a)(1)(B) may also apply.

Another problem with this argument is the general/specific rule is applied when addressing "two different criminal statutes," yet here only one statute is involved. *Euler*, 314 Kan. at 395 (describing the rule as applying "when a set of facts supports a conviction under two different criminal statutes"). Ross has provided no caselaw which addresses or applies this rule in the context of charging different ways of committing the same offense, like in the child abuse statute. See *State v. De La Torre*, 300 Kan. 591, 607, 331 P.3d 815 (2014) ("The types of abuse enumerated in the statute, such as 'cruelly beating' and 'cruel and inhuman corporal punishment,' simply describe two factual circumstances that could satisfy the abuse element.").

Our dissenting colleague also contends the district court was correct to dismiss the second count against Ross but for a different reason than the court articulated. While the dissent does not contend the evidence at the preliminary hearing was insufficient to provide probable cause that Ross cruelly beat or cruelly struck his son, it argues that the State cannot legally bind Ross over under (a)(1)(A) because the conduct at issue was undertaken as corporal punishment. He interprets K.S.A. 21-5602 to require the State to

charge defendants under (a)(1)(B) (cruel and inhuman corporal punishment) if the evidence shows the actions were done for the purpose of discipline. Slip op. at 45 (Atcheson, J., concurring in part and dissenting in part).

We respectfully disagree with the dissent's contention that the Legislature intended to shield or legalize torture, cruel beating, cruel striking, or cruel kicking of children in the name of protecting a parent's right to discipline his or her child. That common-law right was never so expansive as to excuse this conduct done by parents, much less anyone claiming discipline as the purpose behind their behavior.

We also believe the dissent's reading of (a)(1)(B) to protect a certain category of actor—parents who use corporal punishment to discipline their children—is incompatible with the statute's overall structure or theme. See *Citizens' Utility Ratepayer Bd. v. Kansas Corporation Comm'n*, 264 Kan. 363, 389, 956 P.2d 685 (1998) ("Courts must 'construe all provisions of statutes *in pari materia* with a view of reconciling and bringing them into workable harmony, if reasonably possible to do so.'"). None of the subsections of the statute address the actor who engaged in the behavior at issue, nor do they establish different standards of behavior depending on whether the actor is a parent or has any relationship with the child. Instead, K.S.A. 21-5602 focuses on the behavior itself—not who is engaging in it. While the dissent presumes only those validly acting *in loco parentis* with the child could claim the benefit of its heightened requirement for corporal punishment to constitute child abuse, it must read words into the statute to make this presumption. Under the plain language of (a)(1)(B), anyone could claim this benefit— even the dissent's interloper who disciplines a stranger's child. We believe such a result is absurd and unintended by the Legislature. See *Todd v. Kelly*, 251 Kan. 512, 520, 837 P.2d 381 (1992) ("[T]he legislature is presumed to intend that a statute be given a reasonable construction, so as to avoid unreasonable or absurd results.").

24

Both Ross and the dissent claim their interpretations are necessary to avoid rendering K.S.A. 2022 Supp. 21-5602(a)(1)(B) meaningless. Ross bases his argument on his contention that proving child abuse under (a)(1)(B) means child abuse under K.S.A. 2022 Supp. 21-5602(a)(1)(A) "is always necessarily proven." And he characterizes (a)(1)(B) as simply containing "one additional and distinct material element" (which requires proving cruel and inhuman corporal punishment) as compared to (a)(1)(A) (which only requires proof of cruelty for beating or striking). The dissent views these subsections like Ross does, arguing the Legislature only intended to criminalize actions undertaken to physically discipline a child that are both cruel and inhuman. And it contends any other reading would give no distinct meaning to the term inhuman and would render it duplicative of the term cruel. Slip op. at 39 (Atcheson, J., concurring in part and dissenting in part).

We do not view the two subsections this narrowly nor do we believe our interpretation renders (a)(1)(B) meaningless or the term inhuman duplicative. For example, there are other forms of corporal punishment which would not satisfy (a)(1)(A) but could be prosecuted under (a)(1)(B). See *State v. Edgar*, 281 Kan. 47, 50, 127 P.3d 1016 (2006) (upholding father's conviction for felony murder and child abuse based on cruel and inhuman punishment for binding or tying children up with socks, duct tape, and plastic ties while placing a sock in one child's mouth, tying a stocking around another child's eyes and mouth, and taping a child's mouth shut to keep the children from getting out of bed and getting into things); *State v. Garrett*, No. 114,191, 2017 WL 2304450, at *10-11 (Kan. App. 2017) (unpublished opinion) (upholding grandmother-babysitter's conviction for cruel and inhuman physical punishment for spraying toddler with scalding water for having a dirty diaper); *State v. Thompson-Dupes*, No. 102,405, 2011 WL 867581, at *5-6 (Kan. App. 2011) (unpublished opinion) (upholding mother's conviction for cruel and inhuman corporal punishment for use of a cattle prod to discipline daughter); *State v. Banks*, No. 86,358, 2001 WL 37132490, at *2 (Kan. App. 2001) (unpublished opinion) (upholding father's conviction for cruel and inhuman corporal

25

punishment for use of a stun gun on his children); *State v. Schofield*, No. 99,766, 2009 WL 2242424, at *5 (Kan. App. 2009) (unpublished opinion) (upholding child abuse conviction involving a "'culmination of activities which rose to the level of child abuse,'" when the State did not contend that any one incident, standing alone, involved the infliction of cruel and inhuman punishment). And the State could prosecute conduct under (a)(1)(A) that would not fall under (a)(1)(B), such as when a defendant claims to have beaten or struck a child for purposes other than punishment. For example, in *State v. Bruce*, 255 Kan. 388, 874 P.2d 1165 (1994), Bruce challenged his convictions for child abuse and felony murder of his fiancée's child. Bruce claimed the child's injuries were caused by Bruce roughhousing with the child while Bruce was intoxicated. 255 Kan. at 391.

Therefore, we do not view (a)(1)(B) as necessarily an expansion on (a)(1)(A)—by simply adding an "inhuman" element to the punishment—nor would it be rendered meaningless by finding the State can bind a defendant over on allegations of conduct outlawed by (a)(1)(A) even when done to punish a child. Instead, we view it more as a catch-all section which outlaws other actions which do not fall under (a)(1)(A) but which qualify as cruel and inhuman corporal punishment. It is true that there may be some overlap between the subsections in certain cases, where actions that fall under (a)(1)(B) would also fall under (a)(1)(A), like cruelly and inhumanely torturing, beating, striking, or kicking a child. Nonetheless, we read the Legislature's intent to outlaw unreasonable acts towards children more expansively than the dissent. And our interpretation still gives independent meaning to (a)(1)(B) by criminalizing actions that do not fall under (a)(1)(A), even if there is some overlap. Again, we simply find it contradictory and unreasonable that the Legislature would specifically outlaw torture and cruel kicking, beating, and striking of children but then allow those behaviors if inflicted as discipline— especially since such actions were not included in the common-law parental privilege.

26

Nothing in the legislative history of Kansas' child abuse statute supports the dissent's compartmentalization of the crime of child abuse or its idea that the Legislature intended to legalize torturing, cruelly beating, cruelly striking, or cruelly kicking children for disciplinary purposes. The Legislature recodified the criminal code in 2011. As part of this effort, it replaced K.S.A. 21-3609 with K.S.A. 2011 Supp. 21-5602. In K.S.A. 21-3609, abuse of a child was defined in one continuous definitional line, as "intentionally torturing, cruelly beating, shaking which results in great bodily harm or inflicting cruel and inhuman corporal punishment upon any child under the age of 18 years." But in K.S.A. 2011 Supp. 21-5602, the Legislature separated this definition into different subsections, defining abuse of a child as "knowingly":

"(1) Torturing or cruelly beating any child under the age of 18 years;

"(2) shaking any child under the age of 18 years which results in great bodily harm to the child; or

"(3) inflicting cruel and inhuman corporal punishment upon any child under the age of 18 years."

In the hearing in the Senate Judiciary Committee on H.B. 2668 (2010) (the bill which proposed these statutory changes), Judge John White reviewed the proposed changes for the committee members and said the recodification of the criminal code (which included this change) "contains no substantive changes." Judge White also told the committee that the "changes include revisions to statutory language to add clarity, reorganization of the statutes in a more user-friendly order, and combined statutes to reduce their number." Minutes, Senate Judiciary Committee, March 8, 2010; see also *State v. Schlein*, 253 Kan. 205, 219, 854 P.2d 296 (1993) ("Where a statute is of doubtful meaning and susceptible upon reading of two constructions, the court may look to other sources, such as the Judicial Council notes, to determine the reason for the Act, and the purpose intended to be accomplished."). This overview indicates the dissent's interpretation of the legislative intent behind K.S.A. 21-5602 is misplaced; the Legislature did not distinguish separate crimes of child abuse to set a stricter standard for physical acts done for the purpose of

27

punishment, but instead, simply attempted to add clarity and make Kansas' criminal statutes—including the child abuse statute—more user friendly.

The dissent points out that the Legislature substantially revised K.S.A. 21-5602 in 2022, which is true. While we agree this revision expanded the specific ways a person could commit the crime of child abuse and expanded the range of presumptive punishments, we disagree with the dissent's contention that this revision impacts our decision in this case. See slip op. at 35-36 (Atcheson, J., concurring in part and dissenting in part). Before this revision, the pertinent part of the statute read:

"(a) Abuse of a child is knowingly:
(1) Torturing or cruelly beating any child under the age of 18 years; [or]
. . . .
(3) inflicting cruel and inhuman corporal punishment upon any child under the age of 18 years." K.S.A. 2019 Supp. 21-5602.

After the 2022 revision, the pertinent part of the statute read:

"(a) Abuse of a child is committing any of the following acts against a child under 18 years of age:
(1)(A) Knowingly torturing, cruelly beating, cruelly striking or cruelly kicking; [or]
(B) knowingly inflicting cruel and inhuman corporal punishment." K.S.A. 2022 Supp. 21-5602.

Again, the pertinent changes appear to be cosmetic and designed to enhance readability, not to shield other acts outlined in the statute if done in the name of parental discipline, as the dissent claims (or to create heightened protections for parental discipline as was proposed in 2014 in H.B. 2699). And we think our interpretation is

further bolstered by the fact that the subsections setting forth the different ways in which the crime can be committed are separated by the word "or" instead of "and."

The dissent's attempt to soften the harsh result of its interpretation by noting that even though a parent may not be criminally prosecuted, they could still end up in child in need of care proceedings for cruelty towards their child that does not qualify as "cruel and inhuman corporal punishment" is also unsettling. Inconsistent definitions of acceptable parental behavior will not foster justice or equality, nor would it align with commonly accepted and expected notions of fairness and due process under the law. The Due Process Clause of the 14th Amendment to the United States Constitution protects individuals from arbitrary state action, and unequal treatment of the same actions falls squarely within that prohibition. *State v. Genson*, 316 Kan. 130, 138, 513 P.3d 1192 (2022) (Due Process Clause of the 14th Amendment protects individuals from arbitrary state action.). The law should strive for consistency and predictability; it would be of little comfort to parents to know that their behavior was sufficient to terminate their parental rights but insufficient to prosecute them criminally. Similarly, heightening the standard to prosecute parents criminally for torturous or cruel treatment of their children could reasonably be expected to heighten the State's burden to show a child was physically abused or neglected in child in need of care proceedings.

Furthermore, we believe the dissent's interpretation unnecessarily complicates the prosecution and defense of crimes under the statute. If K.S.A. 21-5602 truly shields torture, cruelly striking, cruelly beating, and cruelly kicking a child if done for purposes of discipline, then in addition to litigating the quality of the behavior (whether it was inhuman and therefore outlawed under [a][1][B]), the parties would also have to litigate difficult-to-resolve disputes about the motive behind the behavior (whether the motive was to discipline and perhaps even whether, like here, the disciplinary motive was appropriate).

29

The dissent's interpretation also encourages gamesmanship by defendants who can simply claim their actions were done for the purposes of discipline to raise the bar for the State's case. And the dissent's proposed solution of alternative charges is not a practical resolution to these problems because that posture makes the case more difficult for a defendant to defend and the State to prosecute—especially if the professed disciplinary motive is not revealed until trial.

The situation in *State v. Clark*, No. 124,497, 2023 WL 2618969 (Kan. App. 2023) (unpublished opinion), demonstrates some of the practical problems created by our dissenting colleague's interpretation of K.S.A. 21-5602. Clark was charged with child abuse under K.S.A. 2019 Supp. 21-5602(a)(1) for beating or torturing her boyfriend's four-year-old daughter. Clark's boyfriend noticed bruising, scratches, and a bite mark on his daughter's face the morning after he and Clark had a fight. The boyfriend's seven-year-old son said he saw Clark grab his sister by the neck, slam her face on the floor, slap her, and bite her. The son said Clark also grabbed him by the neck and slammed him down because he was not changing his pajamas or clothes fast enough. The children gave conflicting information to interviewing officers and at trial for the reasons why Clark engaged in the actions at issue, some of which included saying they did not know why Clark did what she did. 2023 WL 2618969, at *2-3. Clark challenged her conviction on appeal in part by claiming the State had not proven she tortured the daughter because it failed to show punishment was the purpose for which she inflicted pain on the daughter. 2023 WL 2618969, at *7. We rejected her challenge after determining the State did not need to show punishment was the purpose for her actions. We noted the definition of torture is not limited to the infliction of pain for the purposes of punishment, because Black's Law Dictionary defines the term to include inflicting intense pain to body or mind for purposes of punishment or for sadistic pleasure. 2023 WL 2618969, at *7.

But under our dissenting colleague's interpretation of K.S.A. 21-5602, either the State would have to show the reason why Clark tortured the child (to justify whether it

30

charged under [a][1][A] or [a][1][B]) or the jury would have to decide under which section to convict if the State charged in the alternative. Either way, that decision would be based on information provided by very young children either soon after they suffered emotional and physical trauma or years later. And the dissent's rigid interpretation does not address mixed motive cases, where, for example, Clark's motivations might have included both retribution against her boyfriend after the fight and disciplining his children.

Clark also pointed out that it was only at trial that the children offered a punishment motive for the behavior, so the State, in the dissent's scenario, would have to amend the charges at trial to address this development, another less than ideal situation for both sides. See 2023 WL 2618969, at *7. Our interpretation of K.S.A. 21-5602 avoids these problems because it would allow the State to charge under (a)(1)(A) for torturing the child and the parties could focus their efforts on litigating whether the actions qualified as torture and whether the defendant committed the actions, rather than also litigating the reasons behind the behavior.

Another illustration of the difficulties inspired by the dissent's interpretation of K.S.A. 21-5602 can be found in *State v. Hupp*, 248 Kan. 644, 653, 809 P.2d 1207 (1991). There, a baby died from a skull fracture after being in Hupp's care. Hupp claimed the baby started wriggling and he dropped him. Medical experts testified the baby's injuries were not consistent with this explanation and the most likely cause of the injuries was the baby being hit by a fist. The baby's mother told someone Hupp did not mean to injure the baby, but Hupp had gotten tired of the baby's crying and fussing all the time. 248 Kan. at 648-49. After his conviction, Hupp argued the jury should have been instructed differently. Our Supreme Court disagreed, after explaining that an intent to injure is not required to establish either a cruel beating or cruel and inhuman corporal punishment under K.S.A. 21-3609 (a predecessor to K.S.A. 21-5602). 248 Kan. at 653. The court went on to observe: "The fact that [Hupp] may have only intended to stop [the baby]

31

from crying is irrelevant. Child abuse does not require more than one blow. A blow that crushes an infant's skull and kills the child is, as a matter of law, a 'cruel beating.'" 248 Kan. at 653. But the dissent's interpretation of K.S.A. 21-5602 contravenes this statement since it would find Hupp's purpose for acting *is* relevant. Because if the jury found Hupp struck the child to stop the baby from crying, his action would constitute corporal punishment. Then the State would have to charge him under (a)(1)(B) and prove both the cause of the injury and that the cause was cruel and inhuman. Or it would have to charge him in the alternative and the jury would have to decide, based on the circumstantial evidence presented (which included Hupp's past acts of unreasonable punishment of the baby), both whether Hupp intended to strike the baby and his purpose for doing so.

The dissent's reasoning also fails to land squarely in this case. For instance, the dissent admits Ross' actions which gave rise to count one—when he twisted his son's shirt, choking him—"seems to have been part and parcel of one of the" instances where Ross was disciplining his son for behavior Ross judged to be improper. Slip op. at 41 (Atcheson, J., concurring in part and dissenting in part). Yet the dissent believes the district court erred when dismissing this charge under K.S.A. 21-5602(a)(3)(C), which criminalizes "knowingly impeding the normal breathing or circulation of the blood by applying pressure on the throat, neck or chest of the child or by blocking the nose or mouth of the child in a manner whereby death or great bodily harm could be inflicted." But according to the dissent's interpretation of K.S.A. 21-5602, a defendant can only be bound over under (a)(1)(B) for physical contact initiated to discipline for or to discourage improper or unwarranted behavior. Therefore, under the dissent's interpretation of K.S.A. 21-5602, we fail to see why the district court was not also right for the wrong reason to dismiss count one.

In short, we do not believe the district court was right for the wrong reason to dismiss the charge under count two. We do not find either Ross' or the dissent's statutory arguments on this point to be convincing.

2. *We believe the facts sufficiently established probable cause to bind Ross over on count two.*

In reviewing the evidence presented at the preliminary hearing, we find it sufficient to show probable cause to support the charge in count two—which was based on allegations that Ross cruelly beat or cruelly struck A.R. Ross does not dispute that the evidence shows he beat or struck his child, and whether that conduct was cruel is a fact question for a jury to decide. On the standard employed at a preliminary hearing—again, which is whether the evidence is sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief Ross committed the charged crime—we find the State met its burden of establishing probable cause for count two. We therefore remand that charge to the district court.

III. *We decline to consider Ross' constitutional challenge to K.S.A. 21-5602 on appeal.*

On appeal, Ross argues the district court was correct to dismiss the charge in count two because K.S.A. 2022 Supp. 21-5602(a)(1)(A)'s use of the word cruel renders this portion of the statute constitutionally void for vagueness. He argues in the context of parental discipline, a parent cannot know whether beating or striking is cruel. But Ross did not make this argument below, nor has he explained why we should consider it now, as required by Kansas Supreme Court Rule 6.02(a)(5) (2025 Kan. S. Ct. R. at 36) ("If the issue was not raised below, there must be an explanation why the issue is properly before the court.").

Generally, issues not raised before the district court cannot be raised on appeal. *State v. Green*, 315 Kan. 178, 182, 505 P.3d 377 (2022). And more specifically, "constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review." *State v. Pearce*, 314 Kan. 475, 484, 500 P.3d 528 (2021). While the Kansas Supreme Court recognizes some limited exceptions to this rule, the party asserting the issue for the first time on appeal must invoke an exception. *State v.*

*Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). Ross did not invoke any exception nor provide any reason we should consider his argument for the first time on appeal.

We decline to consider Ross' constitutional concerns for the first time on appeal. Moreover, the Supreme Court has already rejected this argument about the same language in K.S.A. 21-3609, the predecessor statute to K.S.A. 21-5602, in *Hupp*, 248 Kan. at 656 (words like torture and cruelty provide reasonably definite standards which one reading the statute can understand and contemplate).

CONCLUSION

Having found probable cause to support both charges against Ross, we reverse the district court's dismissal of them. We remand the case to the district court to reinstate both charges and bind Ross over for further proceedings on both charges in conformity with this opinion. We decline to grant the State's request to order the case be assigned to a different judge on remand although nothing in this opinion should be read to preclude that from happening for reasons such as judicial economy or efficiency.

Reversed and remanded with directions.

* * *

ATCHESON, J., concurring in part and dissenting in part: The State has appealed a ruling of the Sedgwick County District Court dismissing two counts of criminal child abuse against Defendant Terry Allan Ross for choking and then beating his young son. The appeal requires us to reach into a legal thicket bristling with thorns. The district court relied heavily on the parental discipline doctrine—a common-law defense of uncertain scope. The Legislature substantially overhauled the child abuse statute in 2022, and the revised measure confounds easy application here. But the statute imposes a demanding

standard for criminally prosecuting corporal punishment, thereby abrogating the doctrine as a defense to the crime of child abuse. K.S.A. 21-5602(a)(1)(B) (actionable corporal punishment must be "cruel and inhuman").

Based on the uncontroverted evidence admitted at Ross' preliminary hearing, the State presented a sufficient factual basis for the choking charge—a form of child abuse falling outside the statutory limitation on corporal punishment. So I concur in the majority's decision reversing and reinstating that count for further proceedings in the district court. But the evidence established that Ross struck his son to discipline him, and the State did not charge him with child abuse for inflicting unlawful corporal punishment. That count should have been dismissed for that reason. Because the State brought the charge under an inapplicable subsection of the statute, I dissent from the majority's decision to reinstate that count. The district court reached the right conclusion for the wrong reason, so I would affirm that part of its ruling.

The pieces of this legal puzzle do not fit together seamlessly, and that's part of the problem in effectively analyzing the issues. I first review the child abuse statute and then outline the evidence the State presented at Ross' preliminary hearing and the standards governing how the district court and this court should assess that evidence. I then explain how I see those facts meshing with the statutory language. As part of that exercise, I discuss why the district court incorrectly relied on the parental discipline doctrine and why the majority offers a peculiar reading of the child abuse statute to avoid what many might view as an unfortunate legislative public policy shielding a swath of severe corporal punishment—a viewpoint we may acknowledge but cannot accommodate. Finally, I discount the State's late reliance on dicta in *State v. De La Torre*, 300 Kan. 591, 607, 331 P.3d 815 (2014), that is now quite dubious given the Legislature's more recent revision of the child abuse statute and the Kansas Supreme Court's even more recent near categorical retrenchment from its alternative means jurisprudence. See *State v. Reynolds*, 319 Kan. 1, 17, 552 P.3d 1 (2024).

*The Child Abuse Statute*

In 2022, the Legislature substantially revised K.S.A. 21-5602, the statute proscribing child abuse, by expanding the specific ways a person could commit the crime, assigning each way a particular culpable mental state, and expanding the range of presumptive punishments. The amended statute went into effect on July 1, 2022, and, therefore, applied to Ross' conduct toward his son in mid-August 2022. The statute remains unchanged and provides:

"(a) Abuse of a child is committing any of the following acts against a child under 18 years of age:

(1)(A) Knowingly torturing, cruelly beating, cruelly striking or cruelly kicking;

(B) knowingly inflicting cruel and inhuman corporal punishment; or

(C) knowingly using cruel and inhuman physical restraint, including caging or confining the child in a space not designated for human habitation or binding the child in a way that is not medically necessary;

(2) recklessly causing great bodily harm, abusive head trauma, permanent disability or disfigurement; or

(3)(A) knowingly causing great bodily harm, abusive head trauma, permanent disability or disfigurement;

(B) knowingly inflicting cruel and inhuman corporal punishment with a deadly weapon; or

(C) knowingly impeding the normal breathing or circulation of the blood by applying pressure on the throat, neck or chest of the child or by blocking the nose or mouth of the child in a manner whereby death or great bodily harm could be inflicted.

"(b) Abuse of a child as defined in:

(1) Subsection (a)(1) is a:

(A) Severity level 5, person felony if the child is at least six years of age but less than 18 years of age; and

(B) severity level 3, person felony if the child is under six years of age;

(2) subsection (a)(2) is a severity level 4, person felony; and

(3) subsection (a)(3) is a severity level 3, person felony." K.S.A. 21-5602.

36

The statute identifies and then groups various actions as proscribed forms of child abuse, creating a taxonomy based at least in part on the severity of the conduct and the potential for lasting harm or even death to the child. To be sure, every form of criminal child abuse constitutes a serious felony punishable with lengthy prison terms and presumptive incarceration of a convicted defendant rather than probation. The actions proscribed in subsection (a)(1), including corporal punishment, carry the lightest presumptive punishment, unless the child is less than six years old. But corporal punishment constitutes child abuse only if it is cruel and inhuman in contrast to beating, striking, or kicking that otherwise need only be cruel.

The various forms of conduct proscribed in subsections (a)(2) and (a)(3) demand more severe penalties and entail potentially life-threatening actions or the use of deadly weapons. So they are distinct from the corporal punishment generically described in subsection (a)(1)(B). That sort of punitive hierarchy—providing some protection for corporal punishment or parental discipline but excluding especially dangerous conduct from that protection—is common across jurisdictions. See Restatement of the Law, Children and the Law, Tentative Draft No. 1 § 3.24, comment f (2018) ("Some types of corporal punishment pose such a risk to the child, and are so far afield from the kinds of corporal punishment protected by case law, that they are presumed unreasonable[,] . . . includ[ing] . . . burning[] or cutting a child; interfering with a child's breathing; and threatening a child with a deadly weapon.").

Overall, then, K.S.A. 21-5602 criminalizes a range of conduct but not always in an especially clear or harmonious manner. The State charged Ross with one count of child abuse under K.S.A. 21-5602(a)(3)(C) for choking his son and a second count under K.S.A. 21-5602(a)(1)(A) for beating him and simply recited the statutory language for each without factual elaboration other than the child's age. The charges against Ross illustrate the statute's occasional lack of clarity.

For example, in K.S.A. 21-5602(a)(3)(C), the concluding phrase "in a manner whereby death or great bodily harm could be inflicted" might apply only to conduct that blocks a child's nose or mouth, as the nearer antecedent action, or it could apply to both descriptions of child abuse. In presenting their arguments, the parties assume the latter reading of the language. And given the evidence, Ross would have been properly bound over for trial either way. "Knowingly" is a statutorily defined culpable mental state, essentially the mens rea, that requires a defendant to be "aware of the nature of [their] conduct." K.S.A. 21-5202(i). That would require proof a defendant either knew they were impeding the child's breathing or circulation with pressure to the child's body as described or knew they were blocking the child's nose or mouth. In addition, the culpable mental state would seem to require that a defendant actively appreciate that their conduct might cause great bodily harm or death to the child in that factual circumstance. So a person could not be convicted for only briefly engaging in the proscribed conduct—a period presumably measured in a few seconds rather than minutes.

Reading K.S.A. 21-5602(a)(1)(A) is a similarly uneasy exercise because the constituent forms of wrongdoing are not parallel actions. Three kinds of identified abuse clearly entail physical contact: beating, striking, and kicking. But striking and kicking include one-time contacts, such as a slap to the face or, colloquially, a kick in the butt. Beating, however, entails sequential physical contacts in close succession. And those actions constitute criminal conduct only if they are done "cruelly," delineating a deliberate intent to inflict pain and suffering. See Webster's New World College Dictionary 356 (5th ed. 2018) (defining "cruel"). Torture is not qualified in that way in the statute, although the word itself connotes marked cruelty. See Webster's New World College Dictionary 1530 (defining "torture" as "the inflicting of severe pain," commonly for some ulterior purpose such as obtaining information or exacting revenge). But torture is not limited to physical infliction of pain and includes "mental pain[,] agony[, or] anguish." Webster's New World College Dictionary 1530. So, for example, threatening to

38

kill a child's pet or actually doing so, especially in the child's presence, might be prosecutable abuse under K.S.A. 21-5602(a)(1)(A).

Pertinent here, in a separate subsection, the statute criminalizes "cruel and inhuman corporal punishment"—a legislative designation that causes the majority a fair amount of consternation. K.S.A. 21-5602(a)(1)(B). By definition, corporal punishment is physical contact initiated to discipline for or to discourage impermissible or wrongful behavior. See Webster's New World College Dictionary 333 ("corporal punishment" defined as "punishment inflicted directly on the body"); Webster's New World College Dictionary 1180 ("punishment" defined as "a penalty imposed . . . for wrongdoing"). So beating, striking, and kicking would be forms of corporal punishment if administered for a disciplinary purpose. But the Legislature has determined that corporal punishment may be treated as criminal only if it is both cruel *and* inhuman, a stricter standard than for prosecutable abuse under K.S.A. 21-5602(a)(1)(A). Any other reading would give no distinct meaning to the term "inhuman" and would render it duplicative of the term "cruel." Courts generally should not construe statutes in ways that render some language superfluous or vestigial. *State v. Van Hoet*, 277 Kan. 815, 826-27, 89 P.3d 606 (2004); *State v. Zendle*, No. 124,683, 2023 WL 581530, at *2 (Kan. App. 2023) (unpublished opinion). I see no apparent reason to deviate from that rule here and doing so would deviate from the legislative intent behind K.S.A. 21-5602(a)(1)(B). Beating, striking, or kicking administered as corporal punishment, therefore, may be successfully prosecuted as child abuse only if the conduct is cruel and inhuman.

My colleagues obviously do not like how the Legislature has made corporal punishment more difficult to prosecute than other forms of child abuse. They have gone to remarkable lengths in distorting the statutory language to suit their policy preference that would strip away the legislative protection for corporal punishment. To get there, they characterize the elaborate structuring of K.S.A. 21-5602 as "cosmetic" and no more than a device to promote "readability," slip op. at 28, rather than a legislative

39

determination to preclude criminal prosecution of some corporal punishment as child abuse. Although I, too, would craft a statute less forgiving of corporal punishment, we cannot indulge those inclinations. See *State v. Spencer Gifts*, 304 Kan. 755, Syl. ¶ 4, 374 P.3d 680 (2016) ("Questions of public policy are for legislative and not judicial determination, and where the legislature declares a policy, and there is no constitutional impediment, the question of the wisdom, justice, or expediency of the legislation is for that body and not for the courts."); *State v. Baumgarner*, 59 Kan. App. 2d 330, 335, 481 P.3d 170 (2021) ("We do not have the prerogative to recraft a statute to suit our view of tidy drafting or good public policy.").

To advance their desired reading of the child abuse statute, the majority says a defendant administering a beating or striking or kicking a child as corporal punishment could be charged and convicted under either K.S.A. 21-5602(a)(1)(A) or (a)(1)(B). No competent prosecutor would proceed under (a)(1)(B) and assume the greater burden of proving cruel *and* inhuman conduct to convict. But to show that (a)(1)(B) serves an actual purpose, the majority contends any form of corporal punishment other than beating, striking, or kicking should be charged under that subsection. To facilitate the prosecution and conviction of Ross in this case, the majority creates dual forms of prosecutable corporal punishment with different elements depending on the conduct—a bifurcation defying the statutory language. Nothing suggests the Legislature intended to make some types of corporal punishment more difficult to prove under K.S.A. 21-5602(a)(1) than other types of corporal punishment. The duality simply imposes a phantom division that abides no obvious or especially sensible legislative purpose. Had the Legislature meant what the majority imputes, it could have (and presumably would have) explicitly excluded beating, striking, or kicking from the phrase "corporal punishment" in K.S.A. 21-5602(a)(1)(B).

*Preliminary Hearing Evidence and Legal Standards*

The State's evidence at the preliminary hearing showed Ross had grabbed his seven-year-old son's shirt collar and twisted it so that the child could not breathe. The boy reported that he unsuccessfully tried to break his father's grip for fear that he might die. Ross held the shirt tightly enough and long enough that it left visible marks on his son's neck, as a rope or other ligature might have. The evidence also showed that Ross had repeatedly struck his son with a large stick and a belt. Those blows also left obvious bruising on the child. In this appeal, the State has conceded the evidence did not establish "cruel and inhuman" harm. Supplemental Brief of Appellant, at *7 ("It is the State's position that the evidence was not sufficient to rise to the level of being 'inhuman' as it has been defined by case law[.]"). I have no reason to reject the concession, although conclusively characterizing the injuries that way might be debatable.

The State's evidence also established that Ross hit his son with the stick and the belt to punish him for holding hands with a male classmate at school and for accepting a necklace from the other child at school a few days earlier. There were two disciplinary episodes, one corresponding to each interaction between the children. Although the evidence that Ross acted to punish his son could not be characterized as extensive, it was uncontroverted. Ross' conduct in twisting the child's shirt collar seems to have been part and parcel of one of the episodes. Whether Ross intended that conduct as punishment winds up being legally beside the point.[1]

[1] The reason Ross chose to punish his son reflects a value judgment that has no bearing on the legal issues. I may disagree with that judgment. But my disagreement has played no part in my assessment of the State's appeal. The manner in which Ross chose to discipline his son matters and reflects the core dispute here.

As is common at preliminary hearings, Ross cross-examined the State's witnesses but offered no evidence. Consistent with K.S.A. 22-2902(c), governing preliminary

hearings, Ross' son did not testify, and his account came in as hearsay through the testimony of adults who had talked with him.

In determining whether the prosecution has presented sufficient evidence at a preliminary hearing to hold a defendant for trial, the district court must consider that evidence in the best light for the State. So conflicts in the testimony or other evidence must be resolved in the State's favor. *State v. Bell*, 268 Kan. 764, 764-65, 1 P.3d 325 (2000). And the State must be given the benefit of reasonable inferences drawn from the evidence. *State v. Anderson*, 270 Kan. 68, 71, 12 P.3d 883 (2000). But the district court is not free to disregard undisputed evidence. In reviewing a State's appeal from the district court's dismissal of charges following a preliminary hearing, we also apply those standards. See *State v. Fredrick*, 292 Kan. 169, 171, 251 P.3d 48 (2011).

The question for the district court at a preliminary hearing is whether a felony has been committed and whether there is probable cause to believe the defendant committed that crime. K.S.A. 22-2902(c); *State v. Washington*, 293 Kan. 732, 733, 268 P.3d 475 (2012). Probable cause requires only that a person of "'ordinary prudence'" would, based on the evidence, "'entertain a reasonable belief of the accused's guilt.'" 293 Kan. at 734 (quoting *State v. Berg*, 270 Kan. 237, 238, 13 P.3d 914 [2000]). Comparatively weak evidence is sufficient to find probable cause, and the district court should hold the defendant for trial even if conviction seems unlikely. 293 Kan. at 734.

*The District Court's Decision and the Parental Discipline Defense*

The district court ruled from the bench that the State had presented insufficient evidence to show Ross committed unlawful child abuse when he twisted the collar of his son's shirt in a way that substantially impaired the seven-year-old's ability to breathe. The district court reasoned that Ross did not act, in the words of the statute, "in a manner whereby death or great bodily harm could be inflicted." K.S.A. 21-5602(a)(3)(C). There

is no question at this stage that Ross impeded the child's "normal breathing . . . by applying pressure on the [child's] throat [or] neck." See K.S.A. 21-5602(a)(3)(C). Those elements of the crime were plainly established.

Assuming the "in a manner" phrase defines an element of that form of child abuse, the evidence was sufficient to satisfy the preliminary hearing standard. The crime does not require that the defendant's conduct actually inflict great bodily harm or death on the child—only that the "manner" in which the defendant has acted *might* do so.

Here, Ross constricted his son's breathing with sufficient force and duration to leave marks on the child's neck and for the child to fear he might die. That's enough to hold Ross to answer at a trial. We needn't await expert testimony to understand that prolonged impairment of a person's breathing through strangulation may lead to cognitive impairment or death. The circumstantial evidence permits a reasoned conclusion that Ross twisted the child's shirt collar forcefully and for more than just a few seconds. Whether those circumstances (and whatever additional evidence the State might present at trial) would persuade a jury of Ross' guilt beyond a reasonable doubt is of no legal consequence. I, therefore, agree with my colleagues that the State met its admittedly limited burden at the preliminary hearing. We correctly reverse the district court's ruling discharging Ross on that count and remand with directions that the charge be reinstated for further proceedings.

The district court declined to make an immediate bench ruling on the sufficiency of the State's evidence on the count alleging Ross committed child abuse under K.S.A. 21-5602(a)(1)(A) but suggested the parental discipline defense would not apply. In its written decision, the district court reversed course and considered the defense as the focal point of its decision to dismiss the count based on Ross' beating or striking of his son.

43

The parental discipline defense is a common-law doctrine that holds a parent cannot be criminally prosecuted for administering reasonable forms of physical punishment to their minor child. *State v. Wade*, 45 Kan. App. 2d 128, 139, 245 P.3d 1038 (2010) (recognizing parental discipline as affirmative defense to charge of battery); see *State v. White*, 55 Kan. App. 2d 196, 205-07, 410 P.3d 153 (2017) (recognizing defense, suggesting it is confined to physical force or corporal punishment, and finding district court erred in giving instruction on defense over defendant's objection). In support of the defense, *Wade* cites *State v. Severns*, 158 Kan. 453, 459, 148 P.2d 488 (1944), where the court held without much discussion that the defendant was entitled to an instruction on the parental discipline defense: A person standing *in loco parentis* with a child is privileged to "administer corporal punishment . . . to a reasonable extent." 45 Kan. App. 2d at 137.

Kansas abolished common-law crimes eons ago and permits prosecution for only statutorily defined offenses. See K.S.A. 21-5103(a); see *State v. Young*, 55 Kan. 349, 356, 40 P. 659 (1895). Both *Severns* and *Wade* assume without substantive discussion that common-law defenses remain viable. And *Wade* relies on *State v. Scobee*, 242 Kan. 421, 428, 748 P.2d 862 (1988), recognizing that successive Kansas statutes abolishing common-law crimes made no mention of common-law defenses, so those defenses persist.

For purposes of this appeal, I do not look behind those assumptions and presume defendants may assert a parental discipline defense in some circumstances. But, as judicially created rules, common-law doctrines are not fixed in the way a statute is with legislatively approved language. Rather, they incrementally migrate as courts apply and occasionally modify their contours in response to differing and sometimes novel factual circumstances. Common-law doctrine, therefore, develops "more or less by accretion." *Brown v. Ryan*, No. 104,088, 2011 WL 6309451, at *7 (Kan. App. 2011) (unpublished opinion) (Atcheson, J., concurring). As Professor Edward H. Levi explained the process:

"[S]imilarity is seen between cases; next the rule of law inherent in the first case is announced; then the rule of law is made applicable to the second case." Levi, *An Introduction To Legal Reasoning*, 15 U. Chi. L. Rev. 501, 501-02 (1948). In that analogical method, "the scope of a rule of law, and therefore its meaning, depends upon a determination of what facts will be considered similar to those present when the rule was first announced." 15 U. Chi. L. Rev. at 502. In short, the scope of the parental discipline defense, like other common-law doctrines, is both malleable and indeterminate.

The Legislature, however, wields the authority to abrogate or modify common-law doctrine through statutory enactment. For example, the Legislature did away with the common-law bar against wrongful death actions by passing the predecessor to K.S.A. 60-1901, permitting those claims. See *Leiker v. Gafford*, 245 Kan. 325, 361-62, 778 P.2d 823 (1989). Similarly, the Legislature has codified self-defense, K.S.A. 21-5222, and compulsion, K.S.A. 21-5206, supplanting their common-law counterparts. See *City of Wichita v. Tilson*, 253 Kan. 285, 290-91, 855 P.2d 911 (1993) (recognizing Kansas has codified compulsion defense and leaving "for another day" whether Kansas permits allied common-law defense of necessity).

In K.S.A. 21-5602, the Legislature crafted a modified form of the parental discipline defense replacing the common-law doctrine in prosecutions for alleged child abuse. The Legislature did so by codifying a form of criminal child abuse for "cruel and inhuman" corporal punishment. K.S.A. 21-5602(a)(1)(B). The statute, then, shields corporal punishment administered by beating, striking, or kicking a child—conduct that would otherwise violate K.S.A. 21-5602(a)(1)(A) were it done cruelly. If a defendant has acted to physically discipline a child in that way, the State must show the action to be more than cruel; it must be inhuman, as well. The statutory boundaries of the crime, then, protect parents—to a degree—in how they discipline their children, replicating generally the policy underlying the common-law defense.

The limitation in the child abuse statute extends only to physical discipline—corporal punishment—and does not cover any form of mental or psychological pressure. So, to return to an earlier example, a parent perhaps could be prosecuted for killing a child's pet as a means of punishing the child. The State would have to prove that conduct amounted to "torture" under K.S.A. 21-5602(a)(1)(A). As I have explained, severe psychological abuse would be consistent with the dictionary definition of torture. See *Baumgarner*, 59 Kan. App. 2d at 334-35 (courts appropriately rely on dictionary definitions to give meaning to statutory language).[2]

[2] A defendant might well counter that "torture" in K.S.A. 21-5602(a)(1)(A) refers only to physical duress because all of the other proscribed actions describe physical contact. Nothing in the statute refers directly to mental or psychological abuse of a child. Although "torture" could be liberally construed to include either physical or mental abuse, such a reading would impute a broad meaning largely at odds with the remainder of the statute. And "torture" may be a sufficiently ambiguous term, that the rule of lenity would point toward limiting it to physical abuse. See *State v. Baker*, 56 Kan. App. 2d 335, Syl. ¶ 3, 429 P.3d 240 (2018) ("The rule of lenity requires that language in criminal statutes open to more than one reasonable interpretation be applied to the defendant's advantage."); see also *In re Wrongful Conviction of Spangler*, 318 Kan. 697, 707, 547 P.3d 516 (2024) (as canon of construction, *noscitur a sociis* suggests word of uncertain meaning in statute may be given clarity by surrounding terms or phrases, i.e., through "the company it keeps"). We do not need to give a precise meaning to the word "torture" to resolve this appeal.

But torture arguably falls outside the scope of "corporal punishment" covered under K.S.A. 21-5602(a)(1)(B). By its very nature, torture might fairly be considered cruel and inhuman. More pointedly, corporal punishment must be both cruel and inhuman, replicating the descriptive element for prosecutable beating, striking, and kicking—cruelty—and adding the element of inhumanness, thereby linking those acts in K.S.A. 21-5602(a)(1)(A) with K.S.A. 21-5602(a)(1)(B) in a way that excludes torture.

The heightened requirements for corporal punishment to constitute child abuse presumably apply to anyone validly acting *in loco parentis* with the child, consistent with the common-law scope of the parental discipline defense outlined in *Severns*, 158 Kan. at 459. That would include a legal guardian and perhaps teachers at least during the school day. See *Beshears v. U.S.D. No. 305*, 261 Kan. 555, 560, 930 P.2d 1376 (1997); *S.B. v.*

46

*Sedgwick Co. Area Educ. Svcs.*, 65 Kan. App. 2d 54, 60, 556 P.3d 902 (2024). But an interloper taking it upon themselves to discipline a stranger's child they thought to be unruly or delinquent could not then contend they were administering corporal punishment under K.S.A. 21-5602(a)(1)(B) to deflect a criminal prosecution. See *McReynolds v. State*, 901 N.E.2d 1149, 1154 (Ind. Ct. App. 2009); see also Model Penal Code § 3.08; 2 LaFave, Substantive Criminal Law § 10.3 (3d ed. 2018).

Moreover, the heightened protection for corporal punishment in K.S.A. 21-5602 covers only criminal prosecutions. So a school district could adopt rules making some or all forms of corporal punishment of a student a fireable offense for teachers and other staff. Likewise, a parent administering repeated, harsh corporal punishment—falling short of the "cruel and inhuman" standard—might well find themselves embroiled in a child in need of care proceeding that could result in termination of their parental rights. See K.S.A. 38-2202(d)(3) (defining "child in need of care" to include minor who "has been physically, mentally[,] or emotionally abused or neglected"); *In re F.C.*, 313 Kan. 31, 43-44, 482 P.3d 1137 (2021) (stepfather's conduct, including punishment of child, amounted to emotional abuse supporting in need of care action).

My colleagues rather imperiously dismiss this point on the notion that only severe physical abuse warranting prosecution and conviction of a parent under K.S.A. 21-5602 would permit the State to intervene through the Revised Kansas Code for Care of Children, K.S.A. 38-2201 et seq., in an effort to rehabilitate a dysfunctional family where a child has been physically mistreated. But the State can intervene under the revised code if a child is in need of care, a circumstance that includes having been "physically, mentally[,] or emotionally abused or neglected." K.S.A. 38-2202(d)(3). And the district court then approves and supervises a tailored social service plan to improve the parents' interaction with their child. See K.S.A. 38-2255. If the plan ultimately fails, the district court may terminate the parent-child relationship. K.S.A. 38-2269.

The revised code defines "physical, mental[,] or emotional abuse" as "the infliction of physical, mental[,] or emotional harm"—a considerably less demanding criterion than for any conduct considered criminal child abuse. K.S.A. 38-2202(ee) (statutory definition). My colleagues' notion conflicts with the statutory language of the revised code and the criminal code. Moreover, it ignores the quite distinct purposes of each. The revised code aims to repair and restore families in distress when a child has been mistreated. The criminal code punishes criminal wrongdoers; and with especially serious crimes (such as child abuse), it presumptively calls for incarcerating them upon conviction. Given those differing objectives, the degree of abuse permitting the State to act also differs. That reflects a common policy determination across jurisdictions. Restatement of the Law, Children and the Law, Tentative Draft No. 1 § 3.24 comment d (2018) (Given the differing purposes of criminal prosecution and child-protection proceedings, "courts generally consider reasonableness [of corporal punishment] in light of the overall context, typically giving more leeway to parental decisionmaking when a parent faces criminal liability."). The majority, nonetheless, casts any difference in defining child abuse for purposes of the revised code and for the criminal code as a due process violation—an argument that amounts to a Chicken Little frenzy in tone and substance rather than a serious constitutional proposition, as the dearth of relevant authority confirms.

The child abuse statute itself identifies particular forms of conduct in subsections (a)(2) and (a)(3) that do not qualify as "corporal punishment" under subsection (a)(1)(B). They include reckless or intentional actions "causing great bodily harm, abusive head trauma, permanent disability[,] or disfigurement" on a child. K.S.A. 21-5602(a)(2), (3). Those forms of child abuse carry a higher severity level than cruel and inhuman corporal punishment, reflecting a legislative determination they are more blameworthy and generally deserving of harsher sanctions. See *State v. Proctor*, 47 Kan. App. 2d 889, 931, 280 P.3d 839 (2012) ("Two crimes with the same severity level are in the legislature's view rough moral [or immoral] equivalents."); *State v. Sinclair*, No. 122,441, 2022 WL

48

496786, at *13 (Kan. App. 2022) (unpublished opinion) (Atcheson, J., concurring) ("In a very real sense, then, the severity levels assigned crimes reflect a legislative determination of their comparative moral and legal blameworthiness or, in a word, wickedness.").

Conversely, convictions for cruelly beating, striking, or kicking a child and for cruel and inhuman corporal punishment of a child are severity level 5 crimes unless the victim is less than six years old, and then they are both severity level 3 crimes. K.S.A. 21-5602(b)(1). So the Legislature considers them essentially equally reprehensible. And that equivalence buttresses reading the statute in a way that favors a legislative intent to shield some forms of physical discipline—specifically beating, striking, and kicking—even though the same acts would be criminal if done for some other reason.

*Majority Disregards Legislative Intent and Impermissibly Narrows K.S.A. 21-5602(a)(1)(B)*

The majority's effort to reconcile subsections (a)(1)(A) and (a)(1)(B) upsets the Legislature's ordered treatment of child abuse as a multifaceted crime composed of a constellation of distinct—though similar and occasionally overlapping—actions. As I have said, in that ordering, the Legislature has determined corporal punishment administered by beating, striking, or kicking a child constitutes criminal conduct only if it is cruel *and* inhuman. That's a policy choice the Legislature gets to make in exercising its police powers to fashion criminal statutes. *State v. Genson*, 316 Kan. 130, 138, 513 P.3d 1192 (2022); *State v. Bolin*, 200 Kan. 369, 370-71, 436 P.2d 978 (1968). Although the choice might not be one I would endorse as a legislator (as I have suggested), I am obligated as a judge to uphold legislative policy choices, however unwise, if they transgress no constitutional limitation. *Genson*, 316 Kan. at 138.

49

The majority impermissibly undermines the legislative policy governing criminal child abuse by finding that the State may prosecute beating, striking, or kicking of a child under K.S.A. 21-5602(a)(1)(A), even if the undisputed evidence shows the defendant parent sought to administer discipline and the corporal punishment could not be characterized as cruel and inhuman. In doing so, the majority relegates K.S.A. 21-5602(a)(1)(B) to "catch-all" status applicable only to corporal punishment other than beating, striking, or kicking—a marked narrowing of the subsection. See slip op. at 26. For example, giving a child an emetic to discipline them for eating cookies before dinner likely would be such a corporal punishment. But, at least in the abstract, it probably couldn't be characterized as cruel and inhuman, especially on a one-time basis. Conversely, many forms of physical abuse apart from beating, striking, or kicking, probably would amount to torture, would rise to the level of "cruel and inhuman," or would violate other subsections of K.S.A. 21-5602 and could be successfully prosecuted even though a parent asserted a disciplinary purpose. That accounts for the successful prosecutions of parents for using cattle prods or boiling water ostensibly to discipline their children, as outlined in the cases the majority cites. Slip op. at 25. Those cases do not, however, support prosecuting corporal punishment administered through beating, striking, or kicking a child under K.S.A. 21-5602(a)(1)(A).

In effect, the majority imputes no legal significance to the undisputed evidence that Ross acted to discipline his son and, therefore, administered corporal punishment in striking the child with the stick and belt. Inexplicably, then, the majority would allow (and, really, require) a district court to disregard uncontroverted evidence bearing on the elements of a crime presented during a preliminary hearing. As I have said, the district court must view conflicting evidence in the State's favor, but it cannot simply ignore undisputed evidence. Here, of course, the district court credited the evidence that Ross struck his son as a form of corporal punishment.[3]

[3] In rare circumstances, a district court could find a witness so lacking credibility that even their uncontradicted testimony ought not be believed. But a district court would be acting as a fact-finder in making that determination—something it doesn't do in a preliminary hearing.

In short, in the majority's reading of K.S.A. 21-5602, subsection (a)(1)(B) plays a remarkably limited role—a reading materially distorting the statutory scheme for criminally punishing child abuse and the protective latitude the Legislature has extended to parents in disciplining their children. Because the preliminary hearing evidence established Ross administered corporal punishment to his son and did so in a way the State has conceded in this appeal could not be characterized as cruel and inhuman, I disagree with the decision to reverse the district court on the count charged under K.S.A. 21-5602(a)(1)(A). The State failed to present sufficient evidence to hold Ross for trial.

I do not, however, share the district court's rationale for that conclusion. To reiterate, the Legislature superseded the common-law parental discipline defense for child abuse by codifying a subsection in K.S.A. 21-5602(a)(1) specifically addressing corporal punishment and limiting prosecution to cruel and inhuman actions. The district court, therefore, mistakenly relied on the common-law defense.

The State charged Ross with violating K.S.A. 21-5602(a)(1)(A), a form of criminal child abuse inapplicable to corporal punishment. As the State now concedes, the preliminary hearing evidence fell short as a matter of law in showing Ross inflicted cruel and inhuman abuse on his son, so the district court could not have held him for trial under K.S.A. 21-5602(a)(1)(B). See *State v. Pioletti*, 246 Kan. 49, Syl. ¶ 4, 785 P.2d 963 (1990) (district court "may bind a defendant over on any felony" supported by probable cause at preliminary hearing "whether or not that particular felony has been charged in the information"); *State v. Loggins*, No. 103,345, 2011 WL 3795236, at *2 (Kan. App. 2011) (unpublished opinion). The preliminary hearing evidence supported neither the charge filed under K.S.A. 21-5602(a)(1)(A) nor a charge under any other subsection of the

51

statute, including K.S.A. 21-5602(a)(1)(B). The charge properly should have been dismissed for that reason. I would affirm the district court's ultimate ruling reaching the same result. See *State v. Holley*, 315 Kan. 512, 520, 509 P.3d 542 (2022) (district court may be affirmed if right for wrong reason). And, therefore, I dissent from that part of the majority opinion.

*Two Closing Observations*

• *Charging in the Alternative.* My assessment of K.S.A. 21-5602 might, at first, appear to create something of a guessing game for the State in charging child abuse, especially if there were conflicting evidence on whether a parent acted to discipline their child. Suppose a parent told investigating law enforcement officers they beat their young son as punishment for cussing and talking back. But the officers turned up someone the parent told they got angry and beat their son because he kept asking to play video games rather than watching the football game that was on television. And assume the child had extensive bruising or other injuries that would be considered a cruel beating and perhaps an inhuman one. Given the conflicting evidence, a district court would be obligated to hold the parent for trial on a charge of child abuse for "cruelly beating" under K.S.A. 21-5602(a)(1)(A). But a jury might find the independent witness of doubtful credibility and accept the parent's explanation that they disciplined the child, likely resulting in a not guilty verdict for that reason on a charge brought under subsection (a)(1)(A).

The State may avert being hamstrung in that manner by charging a defendant in the alternative with different ways of committing the same general crime. *State v. Saylor*, 228 Kan. 498, Syl. ¶ 3, 618 P.2d 1166 (1980) (recognizing authority of prosecutor to charge theft in the alternative where "there is a question . . . as to what the evidence will disclose at trial"); see *State v. Roberts*, 314 Kan. 835, 847-48, 503 P.3d 227 (2022) (recognizing viability of charging in alternative as outlined in *Saylor*). At trial, the fact-

finder then has the option of convicting the defendant of the alternative conforming to the credible evidence or, of course, finding the defendant not guilty of all of the alternatives.

In *Saylor*, the court held that a prosecutor could charge and proceed to trial on alternative counts of theft because the statute included various ways of committing the crime that differed—sometimes subtly—in their elements. 228 Kan. at 503-04. Filing alternative counts charging a single act of theft allows the State sufficient flexibility to account for uncertain trial evidence on those elements, while affording the defendant fair notice of the charged crime. As the court explained: "[I]t has been held proper to charge by several counts of an information the same offense committed in different ways or by different means to the extent necessary to provide for every possible contingency in the evidence." 228 Kan. at 503. Charging child abuse under K.S.A. 21-5602 poses the same sort of challenge because the crime encompasses a range of proscribed acts. The State may, in some instances, meet that challenge by charging a defendant with alternative counts of child abuse. In my example, the State could charge the parent with child abuse under K.S.A. 21-5602(a)(1)(A) and, in the alternative, with child abuse under K.S.A. 21-5602(a)(1)(B)—allowing the jurors to consider a form of the crime conforming to their resolution of conflicting evidence. A defendant charged in the alternative can be convicted and sentenced for only one of the alternative counts. See *State v. Vargas*, 313 Kan. 866, Syl. ¶ 3, 492 P.3d 412 (2021).

My colleagues suggest alternative charges would needlessly complicate child abuse cases, as if that were an exotic or bizarre approach in prosecuting crimes, leaving jurors flummoxed in how to render their verdicts. To the contrary, charging in the alternative is a well-accepted tool, especially in cases with uncertain or conflicting factual representations. See, e.g., *State v. Ervin*, 320 Kan. ___, 2025 WL 1088041, at *3 (2025) (defendant charged with felony murder and alternatively second-degree murder); *State v. Kirmer*, No. 125,355, 2025 WL 816685, at *2 (Kan. App. 2025) (unpublished opinion) (defendant charged with rape on alternative theories victim was either too intoxicated to

53

consent or unconscious); *State v. Flesher*, No. 125,821, 2024 WL 5001992, at *2 (Kan. App. 2024) (unpublished opinion) (defendant charged with alternative counts of aggravated battery); see also PIK Crim. 4th 68.090 (2022 Supp.) (recognizing alternative charging and discussing how verdicts should be handled).

In the same vein, they despair that requiring prosecutors to prove corporal punishment to be both cruel and inhuman to convict will encourage "gamesmanship" from some defendants who will falsely claim to have been disciplining the child victim. All of that—in their words—"makes the case more difficult for . . . the State to prosecute." Slip op. at 29-30. The assertion simply points to their real objection—the Legislature has afforded too much protection to parents against criminal prosecution when it comes to physically disciplining their children.

Moreover, it can't come as any surprise to my colleagues that some people accused of serious crimes (and even minor crimes) fabricate accounts to avoid conviction. They may falsely claim self-defense to avert aggravated battery or murder charges or consent to avert rape charges. We quite reasonably count on jurors to sort out competing narratives and to separate the truthful from the mendacious. *State v. Franco*, 49 Kan. App. 2d 924, 936, 319 P.3d 551 (2014) ("Sorting out testimonial inconsistencies and evaluating credibility is a function uniquely entrusted to jurors."); *State v. Dishner*, No. 124,597, 2023 WL 3909807, at *2 (Kan. App. 2023) (unpublished opinion); *Beauclair v. State*, No. 123,671, 2022 WL 17546264, at *3 (Kan. App. 2022) (unpublished opinion) ("[T]he judicial process treats an appearance on the witness stand, with the taking of an oath and the testing of cross-examination, as perhaps the most discerning crucible for separating honesty and accuracy from mendacity and misstatement."). We similarly "'entrust immensely complex issues to juries, as antitrust or groundwater contamination suits illustrate.'" *Mashaney v. Board of Indigents' Defense Services*, 302 Kan. 625, 650, 355 P.3d 667 (2015) (quoting 49 Kan. App. 2d 596, 636, 313 P.3d 64 [2013] [Atcheson, J., concurring in part and dissenting in part]). My

colleagues' professed fear of juror confusion wanders far from the foundational premises of our jury system.

• *Inapplicability of* De La Torre. In its supplemental brief, the State relies on *De La Torre*, 300 Kan. at 607, for the proposition that an intent to discipline or punish is not an element of proving child abuse by cruel and inhuman corporal punishment and, in turn, argues that K.S.A. 21-5602(a)(1)(A) remains an appropriate charge in the face of the uncontroverted evidence Ross beat his son as punishment. The argument is unpersuasive, and that portion of *De La Torre* does not carry the load the State puts on it. The specific discussion in *De La Torre* should be characterized as dicta about a materially different version of the child abuse statute offered to explain away a challenge based on the "super-sufficiency" evidentiary rule in alternative means cases—a doctrine the Kansas Supreme Court has since effectively abandoned. See *Reynolds*, 319 Kan. at 6-7, 17.

The *De La Torre* decision arose in a peculiar procedure posture, although most of the peculiarities are beside the point here. Gabriel De La Torre was charged with felony murder under the criminal code in effect until 2011 for the death of an 11-month-old child left in his care. Child abuse, under the former code, provided the predicate felony for the murder charge. Consistent with K.S.A. 21-3609 (Torrence), the statute that defined child abuse, the jury was instructed the crime entailed "cruelly beating" or "inflicting cruel and inhuman corporal punishment" on a child, among other means. See 300 Kan. at 598.[4]

[4] K.S.A. 21-3609 (Torrence) described the substantive crime this way: "Abuse of a child is intentionally torturing, cruelly beating, shaking which results in great bodily harm or inflicting cruel and inhuman corporal punishment upon any child under the age of 18 years."

55

There was no evidence that De La Torre sought to discipline or punish the child. He testified that he accidentally fell on her. The State's theory had De La Torre beating, kicking, and otherwise abusing the child without ascribing any particular purpose or motive. On appeal, De La Torre argued that the absence of evidence supporting corporal punishment under the jury instruction rendered the conviction infirm as an alternative means crime.

At the time of the appeal, the Kansas Supreme Court had recognized a super-sufficiency requirement that any means of committing a crime submitted to the jury had to be supported by sufficient trial evidence to permit a conviction on that means. Submitting an insufficiently supported or unsupported means required reversal of the conviction without a showing of actual prejudice to the defendant, even though ample evidence supported another means submitted to the jury. In a word, the error could never be harmless. *State v. Wright*, 290 Kan. 194, 205-07, 224 P.3d 1159 (2010); see *Reynolds*, 319 Kan. at 6-7 (describing *Wright*'s super-sufficiency standard). So *Wright* required the reversal of a conviction on the peculiar notion jurors might have convicted a defendant not on a means well-supported in the evidence but on an alternative means wholly unsupported in that evidence though also recited in the jury instructions. See *State v. Dishner*, No. 120,422, 2020 WL 593907, at *1 (Kan. App. 2020) (unpublished opinion) (based on *Wright*, defendant "will get a second trial on the only alternative means of committing sodomy the State actively prosecuted in the first trial and on which that jury heard any evidence simply because the jury was also instructed on alternative means never so much as mentioned in the evidence"). The result both demeans the collective intelligence of the 12 jurors deciding any given criminal case and imposes a stupefying remedy for their imagined dimwittedness. Cf. *Griffin v. United States*, 502 U.S. 46, 59, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991) (no due process violation where jury instructions included means of committing conspiracy insufficiently supported in evidence as to defendant because jurors' "intelligence and expertise" will keep them from relying on "factually inadequate theory" to convict).

To avert the super-sufficiency outcome on the child abuse charge (and in turn the murder charge) in *De La Torre*, the court analogized the then-current version of K.S.A. 21-5602 to K.S.A. 21-3609 and suggested conviction of "cruel and inhuman corporal punishment" did not require proof that the defendant harbored an "intent to discipline." 300 Kan. at 607. The result has the look of verbal feint to avoid a super-sufficiency error requiring reversal under *Wright*. A disciplinary purpose would seem to be a necessary condition for corporal punishment; otherwise, the conduct might be corporal, but it wouldn't be punishment.

But there are good reasons that *De La Torre* does not apply here. First, the court's discussion of K.S.A. 21-5602 at all was dicta because the conviction rested on child abuse under K.S.A. 21-3609. And the Kansas Supreme Court has said its dicta "binds nobody." *State v. Hankins*, 304 Kan. 226, 237, 372 P.3d 1124 (2016). Second, as I have pointed out, the Legislature has substantially revised K.S.A. 21-5602 since *De La Torre* was decided to expressly add specific ways of criminally abusing a child and to ascribe a particular culpable mental state to each way, including the subsection proscribing corporal punishment. A decision predating a major revision of a statute should not be considered controlling when those changes eclipse the rationale for the ruling. *Neal v. United States*, 516 U.S. 284, 295-96, 116 S. Ct. 763, 133 L. Ed. 2d 709 (1996) (force of precedent or stare decisis construing statute undercut when legislative body later materially changes statutory language); *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 989 (7th Cir. 2001) (court should apply stare decisis and adhere to precedential decisions unless "subsequent statutory changes . . . have rendered them infirm"); *Follansbee v. Ooi*, 335 Or. App. 305, 313, 558 P.3d 422 (2024) (court declines to follow "earlier case law" because "intervening amendment to the statutory text" of service statute requires different reading).

Finally, the court has continually, if gradually, retreated from the super-sufficiency rule of *Wright*. The court's first dramatic shift came in *State v. Brown*, 295 Kan. 181,

Syl. ¶¶ 7-11, 284 P.3d 977 (2012), where it offered exhaustive and comparatively restrictive criteria for identifying alternative means that would trigger the super-sufficiency requirement. The retreat became complete with *Reynolds*—the court jettisoned the rule in *Wright* requiring mandatory reversal of alternative means errors and returned to the traditional harmless error standard. 319 Kan. 1, Syl. ¶ 4. Those considerations collectively counsel that *De La Torre* is not controlling authority on the intent or mental state required to prove that corporal punishment constitutes criminal child abuse, even if it might have been a decade ago. See *State v. Kane*, 57 Kan. App. 2d 522, 530, 455 P.3d 811 (2019) (Court of Appeals "duty bound to follow Kansas Supreme Court precedent, absent some indication the Supreme Court is departing from its previous position"). The court has rejected the precise legal doctrine that prompted the discussion in *De La Torre*, and the State's reliance on that discussion is not so much illuminative as shadowy.

*Conclusion*

This is a case of fuzzy law and a thoroughly debatable legislative policy choice resulting in a judicial misfire. The Legislature has shielded a great deal of corporal punishment from prosecution as child abuse. That statutory protection extends to Ross' beating of his son, but it doesn't go so far as his choking of the child. Accordingly, I agree with my colleagues that the district court erred in dismissing the charge for the choking, and it should be reinstated on remand. But when Ross administered a disciplinary beating to the child, he did not act cruelly and inhumanly, as the State concedes, so the district court reached the correct conclusion in dismissing that charge. I dissent from that part of the majority's opinion reinstating that charge.